UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | |
|---|---|
| **MICHAEL MOLITOR** | **CASE NO. 2:24-CV-00114** |
| **VERSUS** | **JUDGE JAMES D. CAIN, JR.** |
| **CITY OF SULPHUR** | **MAGISTRATE JUDGE LEBLANC** |

### MEMORANDUM RULING

Before the Court is a "Motion for Summary Judgment, Motion to Strike Request for Jury Trial and to Strike Requests for Compensatory and Punitive Damages with Respect to Retaliation Claims") (Doc. 14) filed by Defendant, City of Sulphur ("City").

### BACKGROUND

This suit arises from a First Amendment retaliation claim and Americans with Disabilities Act (ADA) retaliation claim that Plaintiff filed after Defendants allegedly disproportionately disciplined him for violating a superior's orders.

In 2019, the Sulphur Chief of Police, Lewis Coats initiated an Internal Affairs ("IA") investigation of Plaintiff following complaints that he could not be located or contacted during his shift.[1] The Internal Affairs ("IA") investigation revealed that from January 2, 2019, through February 10, 2019, Plaintiff spent anywhere from 2 hours to 7 hours parked at the residence of his girlfriend.[2] The IA investigation document several calls for service that Plaintiff failed to respond to because his unit was turned off, his computer was logged

---

[1] Defendant's exhibit 9, p. 4. Lewis Coats was the Chief of Police at this time.
[2] *Id.*

off, and his radio was on but the PTT (push to talk) feature was not utilized.[3] Plaintiff received a counsel letter as a measure of discipline.[4] Police Chief Coats and Plaintiff testified that Plaintiff was also suspended.[5]

It became public knowledge within the Sulphur Police Department that Plaintiff, a married man, was involved in a polyamorous relationship.[6] Initially, Plaintiff was demoted to Sergeant and suspended for fourteen days because of the investigation.[7] Plaintiff's appeal was successful, and the City did not appeal this decision.[8]

John Wall assumed the position of Sulphur Chief of Police after Coats retired in 2022. On October 19, 2022, Wall met with Plaintiff and three other Captains and verbally communicated to them to cease "sitting up" and "patrol more."[9] Clarifying instructions via "Counseling Statements" were given to the Captains (including Plaintiff) between November 29, 2022, and December 2, 2022, that the officers were not to spend more than 2 or 3 hours in one spot.[10]

Chief Walls asked Major Craig Fortenberry to look into Captain Molitor's excessive idle times; Major Fortenberry also review the patrol habits of three other patrol captains.[11] In November 2022, Chief Wall contacted Major Jason Gully to start an investigation of

---

[3] *Id.* pp.
[4] Defendant's exhibit 4, p. 29.
[5] Defendant's exhibit A, Appeal Hearing Transcript (testimony of Police Chief Coats) pp. 73-74; Defendant's exhibit B, Michael Molitor Depo. p. 178:5-22; Defendant's exhibit C, Appeal Hearing, p. 84.
[6] Plaintiff's exhibit E, Connie Rion Depo., p. 86;15-20; Plaintiff's exhibit G, Michael Danahay Depo., p. 37:3-11.
[7] Plaintiff's exhibit H, Lewis Coats Depo., p. 56:1-19; 62:7-21; Plaintiff's exhibit I, Larry Guillotte, Jr. Depo., pp. 55-56.
[8] Plaintiff's exhibit E, Rion Depo., p. 123-124; Plaintiff's exhibit G, pp. 24-25.
[9] Plaintiff's exhibit A, January 30, 2023 Appeal Hearing transcript pp. 143-44, 237.
[10] Plaintiff's exhibit D, Craig Fortenberry Depo. pp. 36, 38.
[11] Plaintiff's exhibit A, p. 251; Plaintiff's exhibit D, Fortenberry Depo., p. 30; Plaintiff's exhibit O.

Plaintiff due to Plaintiff excessive parking of his patrol unit instead of patrolling the streets.[12] On December 7, 2022, Major Gully reported to Chief Wall the result s of his investigation, which indicated that Plaintiff consistently parked his patrol unit for several hours at a time and on three occasions as long as nine or nine and a half hours at one location during a 12-hour shift.[13] Plaintiff agreed that he was not patroling neighborhoods as ordered by Chief Wall.[14] On December 6, 2022, in an IA interview with Gully and Fortenberry, Plaintiff did not deny the accuracy of the data regarding the time he "parked up" during the IA investigation.[15]

Plaintiff was notified that formal disciplinary action was being taken against him on December 28, 2022, for "shirking duties" and failure to obey orders.[16] Plaintiff was disciplined in four ways: (1) a fourteen-day suspension, (2) demotion to the rank of Sergeant, (3) EAP counseling for "burnout", and (4) a prohibition from parking near his girlfriend's home at 512 S. Crocker Steet.[17]

Of the three other Captains, two were found to also have excessive idling or "parking up." These three Captains received an informal counseling sheet.[18]

On January 2, 2023, Plaintiff appealed the disciplinary action to the Sulphur Municipal Fire and Police Civil Service Board ("CSB").[19] On appeal, the CSB reversed all

---

[12] Plaintiff's exhibit D, Fortenberry Depo. p.29:3-8 Plaintiff's exhibit A, p. 251; Plaintiff's exhibit D, Fortenberry Depo., p. 29-30; Plaintiff's exhibit O, email from Wall to Fortenberry.
[13] Defendant's exhibit 3; The results indicate that on shifts, Plaintiff's average "parking" time was 6.2 hours.
[14] Defendant's exhibit 4, Appeal hearing transcript, Molitor testimony, p. 50:17-25.
[15] *Id.* p. 41.
[16] Defendants exhibit 17.
[17] Plaintiff's exhibit A, Appeal Hearing transcript, pp. 229-30, 306-07; Defendant's exhibit 17.
[18] Plaintiff's exhibit A, pp. 65:12-25. Plaintiff's exhibit C, Wall deposition, p. 61.
[19] Amended Complaint, ¶ 29, Doc. 10.

of Plaintiff's disciplines, except the EAP counseling.[20] The City appealed the CSB's reversal to the 14th Judicial District Court. Finding that the CSB had acted in an arbitrary manner, Judge Clayton Davis reversed its decision and fully reinstated the discipline originally imposed by the City.[21]

Plaintiff filed suit on January 19, 2024, raising claims against the City of Sulphur for retaliating against him because of his assistance in another officer's (Smith) ADA claim,[22] and because of his polyamorous relationship and lifestyle. Plaintiff had defended Smith against Coats, Guillotte, and Fortenberry, with regard to Smith's refusal to take a COVID-19 serology or antibody test (as opposed to an antigen/swab test) that would confirm the absence of COVID prior to returning to work.[23] Plaintiff spoke on Smith's behalf and also recorded the conversation, which was later relied upon in the *Smith* lawsuit. Defendants seek summary judgment against Plaintiff's claims, or in the alternative, to strike his requests for a jury trial and punitive and compensatory damages.

## SUMMARY JUDGMENT STANDARD

A court should grant a motion for summary judgment when the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56. The party moving for summary judgment is initially responsible for identifying portions of pleadings and discovery that show the lack of a

---

[20] *Id.* ¶ ¶ *31, 32.*
[21] Defendant's exhibits 5, 6, and 7. Plaintiff's counsel informs the Court that Plaintiff has filed a Petition for Writ of Certiorari to the Louisiana Supreme Court on May 28, 2024, which is currently pending.
[22] *Smith v. The City of Sulphur*, Civ. Act. No. 2:22-0244 (W.D. La.); Police Chief Wall testified that he was unaware of the *Smith* lawsuit, or that it even existed when Plaintiff was disciplined, and he became aware of it when settlement activities occurred in January 2023. Defendant's exhibit 10, pp. 98 -102.
[23] Plaintiff's exhibit J.

genuine issue of material fact. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). The court must deny the motion for summary judgment if the movant fails to meet this burden. *Id*.

If the movant makes this showing, however, the burden then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quotations omitted). This requires more than mere allegations or denials of the adverse party's pleadings. Instead, the nonmovant must submit "significant probative evidence" in support of his claim. *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

A court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The court is also required to view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Clift v. Clift*, 210 F.3d 268, 270 (5th Cir. 2000). Under this standard, a genuine issue of material fact exists if a reasonable trier of fact could render a verdict for the nonmoving party. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

## **LAW AND ANALYSIS**

Plaintiff has asserted claims for retaliation under the Americans with Disabilities Act and discrimination/retaliation for violating his constitutional rights under the First Amendment. The City has moved to dismiss Plaintiff's ADA retaliation claim and First

Amendment discrimination/retaliation claim and to strike Plaintiff's jury demand and request for compensatory damages.

*Plaintiff's ADA retaliation claim*

ADA retaliation claims are evaluated using the *McDonnell Douglas* burden-shifting framework. *Hammond v. Jacobs Field Servs.*, 499 Fed.Appx. 377, 382 (5th Cir. 2012). To establish a *prima facie* case of ADA retaliation, Plaintiff must submit evidence of "(1) engagement in an activity protected by the ADA, (2) an adverse employment action, and (3) a causal connection between the protected act and the adverse action." *Seaman v. CSPH, Inc.*, 179 F.3d 297, 301 (5th Cir. 1999). "Once the plaintiff has established a *prima facie* case, the defendant must come forward with a legitimate, non-discriminatory reason for the adverse employment action." *Id*. "If such a reason is advanced, the plaintiff must adduce sufficient evidence that the proffered reason is a pretext for retaliation." *Id*.

The ADA expressly prohibits discrimination "against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]." 42 U.S.C. § 12203.

Plaintiff maintains that the protected activity is Plaintiff's defense and participation in the *Sean Smith* lawsuit in 2020, regarding the City's position that the COVID-19 test required by the Department was legal. Plaintiff spoke to Police Chief Coats, Major Fortenberry, and Assistant Guillotte and informed them in a meeting that their actions with respect to Smith were illegal. Plaintiff recorded that conversation, which was submitted as

evidence in the EEOC proceeding. Plaintiff remarks that the City had knowledge of the recording, at the latest, as of August 31, 2022.[24]

Defendants argue that the City's disciplinary action as to Plaintiff is too attenuated to satisfy the "but-for" or causation test, and when Police Chief Wall made the decision to discipline Plaintiff for excess "parking up," he was not even aware of the *Smith* lawsuit that was filed prior to Wall becoming Police Chief. As to Plaintiff's 2020 Complaint concerning his own disciplinary action for excess "parking up," Defendants argue that the two-year lapse of time between the Complaint and the subject disciplinary action is too attenuated to establish causation or prove pretext.

Defendant notes that when the City appealed the decision of the CSB, Judge Davis reversed that decision, specifically noting that it was improper for the CSB to not consider Plaintiff's prior 2019 infractions regarding the same conduct that was relevant to that appeal—Plaintiff's excessive "parking up" or idle time. Specifically, Judge Davis wrote:

> In addition, the Board did not allow the City to introduce testimony about formal disciplinary action taken against Captain Molitor in 2019.
>
> ***
>
> The board abused its discretion in denying the introduction of the 2019 documents and in failing to consider the relevance of the 2019 discipline to the 2022 discipline.
>
> The combination of failing to have the full evidence to explain how Molitor's actions differed from the other captains and not considering highly relevant discipline from 2019, led the board to act in an arbitrary manner in revising the discipline.[25]

---

[24] Plaintiff's exhibit N.
[25] Defendant's exhibit 6.

Defendant notes that Mayor Michael Danahay was the ultimate decision maker, as the appointing authority, pursuant to Louisiana Revised Statute 33:2473. However, he did not commence or participate in the investigation of Plaintiff in 2022, and relied on Wall's recommendation of disciplinary action.[26] Defendant contends that Plaintiff has failed to prove that Wall, the ultimate decision maker, harbored the requisite "retaliatory animus" necessary to support. See *Donnelly v. Academic Partnerships LLC*, 2024 WL 1877043, p. 5, (5th Cir. April 30, 2024).

Plaintiff contends that his support of S*mith's* lawsuit[27] against the City regarding the COVID-19 test and the use of his recorded conversation with then Chief Coats, Fortenberry and Guillotte are the protected activities. Plaintiff argues that there is a causal connection between this activity and the City's adverse employment action, namely the above stated disciplinary action for Plaintiff's failure to obey his supervisor's commands regarding excessive "parking up" and/or "idle time."

While the City argues that the 2020 Complaint is the protected activity, Plaintiff argues that he engaged in two subsequent acts of protected participation activities, the last being the City's legal counsel receipt of his recording in support of Smith's ADA claims on August 31, 2022. Thus, Plaintiff's posits that there is no 2-year lapse of time between the alleged protected activity and the adverse action. The Court agrees with Plaintiff that

---

[26] Defendant's exhibit 11, Michael Danahay Deposition, pp. 17-18.
[27] Sith resigned on July 23, 2020, and shortly thereafter filed a Charge of Discrimination claiming constructive discharge in violation of the ADA. Smith filed his lawsuit against the City in January of 2022; the City formally agreed to settle on January 31, 2023, (to be approved on February 13, 2023, by the City council). The City's insurer settled the case without the City's approval, knowing that the City was self-insured for the amount of the settlement, and relying on the insurance contract language that allowed it to settle without the City's consent. Plaintiff's exhibit F, Jennifer Thorn Depo., pp. 33-34, 41:4; 44:7-10 Plaintiff's exhibit V.

the last protected activity (presumably August 31, 2022) is close enough in time to the adverse employment decision to be considered by the Court. However, Wall testified that he had no knowledge of the *Smith* lawsuit, and thus could not have harbored any animus toward Plaintiff when he decided that Plaintiff's infractions warranted disciplinary action.

Plaintiff also suggests that the City had knowledge of the recording on August 31, 2022,[28] when Smith's counsel produced a copy of the recording to the City in connection with Smith's Responses to the City's Requests for Admissions, Interrogatories, and Requests for Production of Documents.[29] Plaintiff does not explain how Wall would have knowledge of this information.

Plaintiff also relies on former Police Chief Coats' knowledge of the *Smith* litigation and Plaintiff's role, and Coats' testimony that "people talk." Here, Plaintiff assumes that everyone was aware of the *Smith* lawsuit.[30]  Here, Coats' testimony is in general as to the knowledge of Plaintiff parking his vehicle at a girlfriend's house, but it is not specific as to Plaintiff's support of Smith concerning his lawsuit. Plaintiff suggests that any rational factfinder could readily determine that Wall had knowledge of the *Smith* lawsuit. But again, Plaintiff does not explain how Wall would have the same knowledge as Coats;  Wall was not the Police Chief when Smith's grievances and lawsuit were filed, nor was Wall involved in any proceedings with regard to that lawsuit. Defendants also note that prior to becoming Police Chief, Wall was in narcotics, a separate department from patrol.[31] The

---

[28] Wall began investigating Plaintiff on November 9, 2022.
[29] Plaintiff's exhibit N.
[30] Plaintiff also relies on the testimony of Rion, in HR, that "eventually everything trickles into my office." Plaintiff's exhibit E, Connie Rion Deposition pp. 91-92.
[31] Defendant's exhibit E, Wall Depo. p. 19.

Court agrees with Defendant, that it is pure speculation as to Wall's knowledge of the *Smith* lawsuit, and Plaintiff's participation therein.

Next, Plaintiff contends that the IA investigation was a material adverse action, and even more so, considering the disciplinary action subsequently taken by Wall. Plaintiff also relies on the fact that the three other Captains received a much lesser disciplinary action than Wall.  However, as noted by Judge Davis, this was not Plaintiff's first infraction for the same conduct.  In making his decision regarding the appropriate discipline, Wall considered that Plaintiff had already been warned and disciplined, including suspension in 2019 for excessive "parking up." Additionally, the other three Captains' "parking up" times were not equivalent to Plaintiff's times.[32] Thus, it would not be proper to compare Plaintiff's discipline with the other three Captains as they were not similarly situated.

Additionally, Plaintiff attempts to make a vagueness argument was to the definition of "shirking up." The Court rejects this argument. Not only had Plaintiff been verbally instructed, and counseled in 2019, he was a veteran with the Police Department since 2003,[33] and knew that parking his car for the length of times previously stated was shirking his duties by excessive idle time, and/or disobeying a command was improper conduct and a violation of the Department's policies.  The Court also rejects Plaintiff's position that because Wall disseminated a Memorandum ("Patrol Supervisor Activities:") on February 6, 2023, after the Board's reversal of the Plaintiff's appeal, the term "shirking duties" is

---

[32] Defendant's exhibit 4, Hearing transcript, pp. 215-217, 249, 283; Plaintiff's exhibit 3, p. 4.
[33] Plaintiff's Statement of Facts, p. 12, Doc. 19.

vague. It is abundantly clear to this Court, that "parking up" for 9 or 9.5 hours in a 12 hour shift is none other than shirking one's duties.

As to pretext, Plaintiff argues that he received an unjust punishment when compared to the lower punishment received by the three other Captains. As noted herein, these three Captains were not similarly situated to Plaintiff and thus Plaintiff's argument fails. Plaintiff suggests that his administrative duties as a Captain should be considered when evaluating what is excessive "parking up." It is beyond comprehension that a Captain of a patrol unit would require 5, 6, 9, or 9.5 hours to perform administrative duties. Here, it appears Plaintiff is grasping for straws that do not exist. There was no pretext. Plaintiff was disciplined because of his excessive idle time and parking up. Additionally, the Court finds that it was proper for Chief Wall to consider Plaintiff's prior 2019 infractions that was the exact same conduct that is the subject of this lawsuit. Plaintiff had already been warned about excessive "parking up" and disciplined for same.

The Court finds for the reasons explained hereinabove that Plaintiff has failed to establish a causal connection between Plaintiff's participation in the *Smith* lawsuit and Wall's investigation and the ultimate discipline of Plaintiff. The Court further finds that even if there was a causal connection, there was no pretext here. Plaintiff was reprimanded due to his "parking up" when he should have been patrolling the streets of Sulphur. Moreover, Defendant had a legitimate, non-discriminatory reason for the adverse employment action. As such, Plaintiff's ADA retaliation claims will be dismissed.

*Free Speech/Expression/Viewpoint/Retaliation/Discrimination*

To establish a *prima facie* case for First Amendment retaliation under the Louisiana

and/or U.S. Constitution, a public employee must show that: (1) he suffered an adverse employment action; (2) he spoke as a citizen, rather than pursuant to his official job duties; (3) he spoke on a matter of public concern; (4) his interest in the speech outweighed the government's interest in the efficient provision of public services; and (5) his speech precipitated the adverse employment action. U.S. Const. Amend. 1; *Hardesty v. Cochran*, 621 Fed.Appx. 771, 775–76, 2015 WL 4237656, at *3 (5th Cir. 2015) (citing *Wilson v. Tregre*, 787 F.3d 322, 325 (5th Cir. 2015)). If the plaintiff establishes a *prima facie* case, the defendant may still prevail if it shows by a preponderance of the evidence that it would have come to the same conclusion in the absence of the protected conduct. *Mt. Healthy City School Dist. Bd. of Edu. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Elements two through four are questions of law that must be resolved by the Court. *Branton v. City of Dallas*, 272 F.3d 730, 739 (5th Cir. 2001) (citation omitted); *Davis v. McKinney*, 518 F.3d 304, 315 (5th Cir. 2008). Element five and the *Mount Healthy* affirmative defense are typically questions for the jury. *See Brady v. Fort Bend Cty.*, 145 F.3d 691, 712 (5th Cir.1998) (considering both "motivating factor" and "Mt. Healthy defense" under section analyzing "Jury's Finding on Causation").

      Plaintiff contends that his choice to make public his relationship with his girlfriend and wife—a polyamorous relationship—is protected by the First Amendment. Plaintiff argues that his belief—in polyamory as a valid relationship model and his consequent engagement in behaviors in furtherance of that belief—is speech/expression that is not within the scope of his duties as a police officer.

Plaintiff then suggests that his belief in a polyamorous relationship is a matter of public concern, citing *Lane v. Franks*, 573 U.S. 228, 134 S.Ct. 2369, 2379 (2014); *Williams v. Fontanez*, 2023 WL 3819296 (D. Md. June 5, 2023): *Roberts v. U.S. Jaycees*, 468 U.S. 609, 104 S.Ct. 3244 (1984), despite arguing that whom he chooses to date and/or marry is a squarely private matter. Plaintiff then remarks that numerous officers with the Sulphur Police Department were aware of his polyamorous relationship. Plaintiff argues that his speech regarding the validity of polyamory as a relationship construct, and his behavior in furtherance of that belief, warrants First Amendment protection. The Court disagrees and rejects Plaintiff's contention that having an open and public polyamorous relationship is a speech/expression protected by the First Amendment, nor do we find that it is a matter of public concern.

Defendant informs the Court that polyamory has not been generally recognized as a protected status under the United States anti-discrimination laws, nor is having a wife and a girlfriend recognized as protected by the Constitution's' Free Speech clauses. Be that as it may, Defendant argues that Plaintiff's discipline had nothing to do with his belief in polyamory. The Court agrees. This case is about Plaintiff not obeying orders and shirking his duties on numerous occasions when he parked up for anywhere from 5 hours to 9.5 hours on a 12-hour shift. To be certain, this case has nothing to do with where he parked, who he was seeing, or if he had a girlfriend and a wife, but the amount of undisputed time he was parked instead of patrolling the streets of Sulphur or responding to calls.[34] There is

---

[34] Defendant's exhibit 4, p. 246. In the month of October 2022, for the entire month, Plaintiff showed up for either 4 or 5 calls.

no evidence to suggest that Plaintiff was disciplined due to his alleged "speech," or that his First Amendment rights were violated. Additionally, there is no evidence that Plaintiff was discriminated against.  The City had a legitimate non-discriminatory reason for the disciplinary actions taken against Plaintiff. As such, Plaintiff's alleged First Amendment violations of discrimination and retaliation will be dismissed.

*Motion to Strike Plaintiff's Jury Demand and Compensatory Damages*

In this lawsuit, Plaintiff has demanded monetary damages as well as equitable relief. It is well settled that in the event Plaintiff had only sought equitable relief, there would have been no right to a jury trial in this case. *See e.g., United States v. Reddoch*, 467 F.2d 897,899 (5th Cir.1972). However, Plaintiff contends that he is entitled to a jury as to his damages regarding the First Amendment retaliation claims. See e.g. *Curtis v. Loether*, 415 U.S. 189, 195 94 S.Ct. 1005 (1974) (holding that an action for damages under the FHA is an action to enforce "legal rights" within the meaning of the Seventh Amendment that requires a jury trial if demanded).

Plaintiff also contends that he is entitled to a jury on his damages claim before the Court considers his claim for declaratory and/or injunctive relief. See *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 473 n. 8, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962) (instructing that it makes "no difference" if the equitable claims presented clearly outweigh the legal claims—even if the "the basic issue of the case taken as a whole is equitable" ... "[A]s long as any legal cause is involved the jury rights it creates control."). Additionally, Plaintiff suggests that because his damages' claim is based on the same set of facts as the equitable claims, (whether Plaintiff's demotion/suspension was retaliatory), the Court is bound by the jury's

factual determinations when considering the equitable claim, citing *Snider v. Consolidation Coal Co.*, 973 F.2d 555, 559 (7th Cir. 1992) (when a lawsuit involves both legal and equitable claims, the legal claims must be decided by the jury before the court resolves the equitable claims). See also *Los Angeles Police Protective League v. Gates*, 995 F.2d 1469, 1473 (9th Cir. 1993; *see also Kairys v. Southern Pines Trucking, Inc.*, 75 4th 153, 161 (3d Cir. 2023).

Additionally, Defendant moves to dismiss Plaintiff's compensatory or punitive damages for retaliation in violation of 42 U.S.C. § 12203(a) [ADA]. Defendant first notes that punitive damages are not permitted against municipalities, and compensatory damages and punitive damages are specifically not permitted for violations of 42 U.S.C. § 12203(a). The Court agrees and will dismiss Plaintiff's punitive damages claims under 42 U.S.C. § 12203(a).

However, as noted by Plaintiffs, neither the U.S. Supreme Court nor the Fifth Circuit have ruled on the availability of compensatory damages for claims of retaliation in violation of the ADA, and there is a circuit split regarding this issue. *Alvarado v. Cajun Operating Co.*, 588 F.3d 1261, 1267 (9th Cir. 2009) ("The lack of uniformity among the courts underscores the complexity of this issue."). However, reviewing courts have upheld compensatory damages awarded to plaintiffs for ADA retaliation claims. *See, e.g., Foster v. Time Warner Entm't Co., L.P.,* 250 F.3d 1189, 1194 (8th Cir. 2001) (affirming jury's award of, inter alia, $75,000 in compensatory damages after "finding that [defendant] terminated [plaintiff] in retaliation for engaging in conduct protected by the ADA"); *EEOC*

*v. Wal-Mart Stores, Inc.*, 187 F.3d 1241, 1249 (10th Cir. 1999) (affirming award of compensatory damages to plaintiff in an ADA retaliation case).

Further, many district courts have concluded that compensatory damages are available to plaintiffs alleging retaliation claims under the ADA. *See, e.g., Walker*, 2020 U.S. Dist. LEXIS 126552, at *3 ("Title I of the ADA links the remedies for a violation of that section, including retaliation, to Title VII of the Civil Rights Act."); *Rumler*, 546 F. Supp. 2d at 1342 ("[T]he remedies for employment retaliation under Title V of the ADA are coextensive with the remedies for employment discrimination under Title I."); *Kotewa v. Living Indep. Network Corp.*, 2007 U.S. Dist. LEXIS 14642, at *9 (D. Idaho Mar. 1, 2007) (compensatory damages and other relief available for ADA discrimination claims are also available for ADA retaliation claims); *Rhoads v. FDIC*, 2002 U.S. Dist. LEXIS 21865, at *4 (D. Md. Nov. 7, 2002) ("[C]ompensatory damages are available to [plaintiff] on her ADA retaliation claim."); *Ostrach v. Regents of the Univ. of Cal.*, 957 F. Supp. 196, 201 (E.D. Cal. 1997) (finding compensatory damages available for ADA retaliation claims).

Still more district courts have denied motions to dismiss a plaintiff's request for compensatory damages for ADA retaliation claims. *See, e.g., Felix v. N.Y.C. Dep't of Educ.*, 2023 U.S. Dist. LEXIS 127610, at *38 (S.D.N.Y. July 24, 2023) (denying defendant's motion to dismiss plaintiff's request for compensatory damages in an ADA retaliation claim because "[i]n the employment discrimination context, the remedies available for violations of the ADA are generally considered coextensive with the remedies available under Title VII, which permits employees to recover compensatory and punitive

damages."); *Rosen v. Pallito*, 2015 U.S. Dist. LEXIS 104088, at *20 (D. Vt. Aug. 5, 2015) (reasoning that while the availability of compensatory damages for an ADA retaliation claim "may be an area for further briefing by both parties, the Court will not prevent a damages claim from going forward at this time").

The Eastern District of Louisiana very recently engaged in a thorough review of the "legal landscape regarding the availability of compensatory damages for retaliation under the ADA." *Fox v. City of Hammond,* 2024 WL 5159301 (E.D. La. Dec. 18, 2024). After confirming that the Fifth Circuit has not resolved the issue, the *Fox* Court declined to make a "premature guess as to how the Fifth Circuit would rule" and, in denying the defendant's motion to dismiss, indicated that the issue may become moot at later stages of the case if evidence did not support the claim. *Id.* at * 2.

Plaintiff requests that the Court take the approach in *Fox* and notes that Defendant's Motion does not argue that Plaintiff lacks evidence to support a claim for compensatory damages. Thus, Plaintiff suggests that the Court deny the motion and allow Plaintiff to present evidence to a jury for their consideration of an appropriate award.

Defendant also moves to dismiss Plaintiff's right to a trial by jury for any claims that are equitable in nature. Defendant maintains that compensatory damages are not available under 12203(a), and thus, there is no right to a jury trial. See *Karmer v. Banc of America Securities, LLC*, 355 F.3d 961 (7 th Cir. 2004), *cert. denied*, 542 U.S. 932, 124 S.Ct. 2876 (2004); *Alvarado v. Cajun Operating Co.,* 588 F.3d 1261, 1269 (9th Cir. 2009) (there is no availability of compensatory and punitive damages for ADA retaliation claims, thus no right to a jury trial); see also *Payne v. Hammond City*, 2025 WL 549360 (U.S.E.D.

La. Feb. 19, 2025); *Harms v. City of N. Platte*, 2017 WL 6501848 (U.S. Neb. Dec. 19, 2017);

As noted above, Plaintiff initially alleged violations of the First Amendment of the Louisiana and United States Constitutions. In his First Amending and Supplemental Complaint, Plaintiff specified that his constitutional claims were to include the new claim under the ADA. In doing so, Plaintiff demanded a jury of the triable issues and requested punitive and compensatory damages. Alternatively, Plaintiff requests that the Court should utilize an Advisory Jury for Plaintiff's ADA retaliation claim under the First Amendment.

Plaintiff acknowledges that neither the First Amendment(s), nor the ADA specifically grants Plaintiff a right to demand a jury; thus, the Court must determine whether Plaintiff has a constitutional right to demand a jury trial. *See Tellis v. LeBlanc,* 2020 WL 211410 (W.D. La. Jan. 13, 2020) (citing *City of Monterey,* 526 U.S. at 708; *Smith v. Barton,* 914 F.2d 1330, 1336 (9th Cir. 1990).

Plaintiff argues that Plaintiff's First Amendment retaliation claim for damages fall squarely under the Seventh Amendment, and factual questions related to those claims must be resolved by a jury. *See Perttu v. Richards,* 605 U.S. ___, 145 S.Ct. 1793 (2025) (citing *City of Monterey,* 526 U.S. at 709, 720-21 (holding that "a § 1983 suit seeking legal relief is an action at law within the meaning of the Seventh Amendment" and that a "predominantly factual question" in such an action is "for the jury")). Plaintiff asserts that his suit for First Amendment retaliation is unquestionably a suit at common law, and the Seventh Amendment commands that, "in Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved…."

U.S. Const. Amend. VII. As such, Plaintiff contends that his jury demand with respect to his First Amendment retaliation claims are proper, despite also acknowledging that neither the Supreme Court nor the Fifth Circuit have firmly established whether compensatory and/or punitive damages (i.e., *legal* claims for relief) are available for ADA retaliation claims.

The Court has dismissed all of Plaintiff's claims asserted, and as such, the issue of punitive and compensatory damages and a jury trial are moot and any ruling at this juncture would be an advisory opinion. Therefore, the Court will pretermit as to the Motions to dismiss Plaintiff's compensatory and punitive damage claims, as well as the motions to strike the jury demand.

## CONCLUSION

For the reasons explained herein, the Motion for Summary Judgment will be granted dismissing Plaintiff's First Amendment discrimination/retaliation claim and Americans with Disabilities Act (ADA) retaliation claim. Because the Court is dismissing these claims, the other Motions to dismiss are moot, and thus no ruling is necessary.

**THUS DONE AND SIGNED** in Chambers on this 30th day of July, 2025.

_____
JAMES D. CAIN, JR.
UNITED STATES DISTRICT JUDGE